**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Carl JENNINGS and John Stepp, Defendants–Appellants.**

**Nos. 90–3503, 90–3504.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1991.

Decided Sept. 16, 1991.

---

the fact of such acceptance or payment or

agreement to the payee's employer....

Gary L. Spartis (argued and briefed), Office of the U.S. Atty., Columbus, Ohio, for the U.S., plaintiff-appellee.

Barry W. Wilford (argued and briefed), Columbus, Ohio, for Carl Jennings, defendant-appellant.

Dennis C. Belli (argued and briefed), Columbus, Ohio, for John Stepp, defendant-appellant.

Before MARTIN and NELSON, Circuit Judges, and WELLFORD, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

In these two cases, consolidated for appeal, defendants Carl Jennings and John Stepp appeal their jury convictions on charges stemming from the illegal manufacture of methamphetamine, a schedule II controlled substance. On October 12, 1989, a federal grand jury indicted Jennings and Stepp for (1) conspiracy to manufacture over 100 grams of methamphetamine, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute over 100 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); (3) maintaining a place for the purpose of unlawfully manufacturing and using methamphetamine, in violation of 21 U.S.C. § 856(a)(1); and (4) creating a substantial risk of harm to human life while manufacturing a controlled substance, in violation of 21 U.S.C. § 858. Jennings was further charged with distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

After an eight day trial, the jury returned guilty verdicts against Jennings on all charges in the indictment and against Stepp on all charges in the indictment except for the charge of maintaining a place for the purpose of unlawfully manufacturing and using methamphetamine for which he was acquitted. On May 31, 1990, the district court sentenced Jennings to a little under 24 and a half years imprisonment followed by 5 years of supervised release and assessed a $300 fine. The court sentenced Stepp to a little over 19 and a half years of imprisonment followed by 5 years

of supervised release and assessed a $150 fine. This appeal ensued.

■ Both defendants raise a plethora of issues on appeal. First, defendants argue that the district court abused its discretion by denying their motions for substitution of counsel without adequate inquiry into the underlying merits. On the day before the trial was scheduled to begin, both Jennings and Stepp submitted letters to the court in which they indicated their dissatisfaction with their respective counsel. Although the record indicates that the district court addressed each defendant as to the underlying reasons for their dissatisfaction with counsel, defendants argue that the district court interrupted them before they had the opportunity to explain his reasons for requesting substitute counsel.

A review of the record does indicate that the district court did not permit the defendants to explain fully their reasons for dissatisfaction with counsel in open court. Instead, the court instructed each defendant to submit his letter to the clerk and indicated it would consider the letters later. Unfortunately, the record does not reveal if the district court did, in fact, consider the letters or whether the district court ever formally made a ruling as to each defendant's request for new counsel. We cannot begin to determine whether the defendant's dissatisfaction with their appointed counsel was justified because neither defendant's letter was made part of the record.

As this court recently stated in *United States v. Iles,* 906 F.2d 1122, 1130 (6th Cir.1990):

It is hornbook law that "[w]hen an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction with his current counsel." LaFave and Israel, *Criminal Procedure,* § 11.4 at 36 (1984).

(citations omitted). Based upon the record before us we are unable to determine whether the district court discharged its responsibility of ascertaining the reasons

underlying the defendant's dissatisfaction with counsel. We therefore feel that remand is necessary for the purpose of allowing the district court to personally inquire from each defendant his reasons for dissatisfaction with counsel. If the district court finds that their reasons do not constitute "good cause," *see, e.g., United States v. Gallop,* 838 F.2d 105, 108 (4th Cir.), *cert. denied,* 487 U.S. 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Wilson v. Mintzes,* 761 F.2d 275 (6th Cir.1985); *United States v. Brown,* 744 F.2d 905, 908 n. 2 (2d Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984), the court would not be required to conduct a new trial. If, on the other hand, the court finds that the defendants did possess "good cause," each would be entitled to new appointed counsel for re-trial. It would be helpful if the two letters submitted by the defendants could be located and made part of the record.

■ Defendants next argue that the district court erred in not granting their respective motions for acquittal on the theory that the government's conduct in its investigation was so outrageous as to violate due process. In support of this argument, defendants contend that the government's conduct in this case is identical to that which led to reversal in *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978). In *Twigg,* the Third Circuit found the government's conduct so overreaching as to violate the defendant's due process rights. The court concluded that:

[u]sing [the informant], and actively participating with him, the DEA agents deceptively implanted the criminal design in [the defendant's] mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and [the informant] encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs.

*Id.* at 381. A review of the record in this case shows significant factual differences from those found in *Twigg*. One critical distinction is that evidence adduced at trial indicated that Jennings was involved in the distribution of methamphetamine and had indicated his intent to manufacture it in the Columbus area prior to any government involvement. The government's informant, Robert Green, testified that he had a conversation with Jennings in which Jennings produced approximately a pound of "ice" and told him that he was both selling it and giving it away in order to establish a client base. Jennings further indicated to Green that he had previously manufactured the drug while living in California and intended to do the same in Columbus. It wasn't until after this conversation that Green contacted government officials and agreed to act as an informant. Luanna Dennis also testified that she was first given methamphetamine from Jennings who indicated to her that he brought it with him from California. Dennis also testified that Jennings had indicated to her that he intended to start making the drug and that he would supply her with the drug in return for her helping him distribute it. Unlike the situation in *Twigg*, this testimony establishes that Jennings was both distributing "crack" in order to establish a client base and attempting to commandeer the necessary chemicals to manufacture the drug prior to any government involvement.

Furthermore, the evidence introduced at trial establishes that it was Jennings, and not the government informant nor any government agent, who possessed the necessary technical information as to how to manufacture the drug. In *Twigg*, it was the government informant and not the defendant who possessed the necessary technical expertise. Indeed, the evidence established that Jennings had manufactured the drug on a number of occasions and was familiar with both the necessary ingredients and the production process. Undoubtedly, the government aided Jennings in the attainment of his stated goal by providing one of the necessary ingredients which he was experiencing difficulty in obtaining. This fact alone, however, does rise to the level of outrageousness required for reversal. With respect to defendant Stepp, there is simply no evidence to suggest that he was enticed by any government agent to join forces with Jennings.

Along similar lines, defendant Stepp argues that he was entrapped as a matter of law. Both defendants raised the entrapment defense at trial which was rejected by the jury. Stepp argues that this finding should be disregarded because the government failed to introduce any evidence of predisposition on his part. We disagree. Before a jury verdict can be overturned, a reviewing court must conclude that no reasonable juror could have concluded beyond a reasonable doubt that the defendant was predisposed to violate the narcotics laws. *United States v. McLernon*, 746 F.2d 1098, 1111 (6th Cir. 1984). The government elicited testimony from Green which indicated that Stepp was involved with Jennings' illegal drug activity prior to any governmental contact. This testimony alone is sufficient to support a jury finding that Stepp was predisposed to commit the crime charged and thus not entrapped.

Stepp also argues that the government failed to prove the existence of a conspiracy between he and Jennings. This argument deserves little attention as the record contains ample evidence to support a conspiracy conviction under 21 U.S.C. § 846. For example, the record establishes that Stepp helped locate and obtain the necessary chemicals. In addition, Stepp was present and aided in the actual manufacture of the drug. In order to prove conspiracy, the government need not prove the existence of a formal agreement between the participants. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir.1986), *aff'd on other grounds*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Instead, the government must only prove that Stepp agreed to participate in what he knew to be a joint venture to achieve a common goal. *Id.* Clearly the evidence supports the jury's determination that Stepp was a willful member of a conspiracy to manufacture and sell methamphetamines.

■ Both defendants argue that the government failed to establish that either was in possession of methamphetamine at the time of his arrest. Defendants base this argument on the fact that the government's chemist did not test the mixture that was "cooking" in the Crockpot until several hours after they had arrested Jennings and Stepp. The government's chemist, Gerald Skowronski, testified that he did not take samples from the mixture at the time of the raid because the chemicals were much too hot and unsafe to be tested. Instead, he turned the Crockpot off and tested the chemicals some ten hours later. That test revealed that the Crockpot contained approximately 4,180 grams of 1.67% methamphetamine. Skowronski admitted on cross-examination that he did not know what percentage of the mixture, if any, had reacted to form methamphetamine at the time of defendant's arrest. Therefore, defendants argue, the government failed to establish that either was in possession of methamphetamine. In reviewing this argument, we must view the evidence introduced at trial in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Gallo,* 763 F.2d 1504, 1508 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986).

■ There is no dispute that some ten hours after the raid was conducted that the mixture in the Crockpot contained methamphetamine; the test conducted by the government's chemist proved as much. The critical question for our purposes, however, is whether the government introduced sufficient evidence to support the jury's determination that the Crockpot contained methamphetamine at the time of the raid. The government indicted the defendants not with the attempt to manufacture methamphetamine, but with the possession of methamphetamine. Thus, in order to sustain its burden of proof, the government was required to introduce evidence upon which a rational jury could have concluded beyond a reasonable doubt that the mixture in the Crockpot contained methamphetamine.

Frankly, we admit that we find this to be a close question, especially in light of the chemist's testimony that he did not know how much, if any, methamphetamine was in the mixture at the time of the raid. Nevertheless, drawing every reasonable inference in the government's favor, *United States v. Woods,* 877 F.2d 477, 479 (6th Cir.1989), we find that the jury was presented sufficient evidence from which they could conclude that defendants were in possession of methamphetamine. In addition to the testimony noted earlier, Skowronski also testified that heat was a necessary element for the chemical reaction which produces methamphetamine to take place. Moreover, Skowronski indicated that he removed the heat source from the mixture immediately upon his arrival at the house. Presumably, from this testimony the jury inferred that when Skowronski removed the heat source from the mixture the reaction slowed and eventually ceased. There was also testimony introduced which indicated that it would ordinarily take approximately twelve hours for the chemicals in the Crockpot to completely react and that when the raid occurred the chemicals had been "cooking" for close to seven hours. Although circumstantial, this evidence is sufficient to sustain defendants' convictions. *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.) (circumstantial evidence alone is sufficient to sustain a conviction), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

Finally, both defendants argue that the district court erred in its application of the Federal Sentencing Guidelines. Specifically, defendants argue that the district court erred in computing their base offense by weighing the total amount of the mixture in the Crockpot, 4,180 grams, which yielded a base offense of 32, instead of the estimated amount of methamphetamine which would have been produced had the chemicals been allowed to react entirely, which the government's chemist testified would have been well over 100 grams. In the

presentence report, the probation officer determined that the defendants' base offense was at level 32 because, "[a]ccording to prosecutorial information, [the defendants] ... manufactured 4,180 grams of methamphetamine."

 In support of the district court's decision to include the total amount of the "mixture" for sentencing purposes, the government points to 21 U.S.C. § 841(b)(1)(A)(viii) and the drug quantity table of the Sentencing Guidelines § 2D1.1. United States Sentencing Commission, *Guidelines Manual,* § 2D1.1 (Nov.1990). 21 U.S.C. § 841(b)(1)(A) provides that:

[A]ny person who violates subsection (a) of this section [making it unlawful to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance,] shall be sentenced as follows:

(1)(A) In the case of a violation of subsection (a) of this section involving—

. . . .

(viii) 100 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 1 kilogram or more of a *mixture or substance containing a detectable amount of methamphetamine,* its salts, isomers, or salts of its isomers; such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life.... (emphasis added).

Similarly, § 2D1.1 of the Sentencing Guidelines provides that:

Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of *any* mixture or substance containing a detectable amount of the controlled substance.... In the case of a mixture or substance containing ... methamphetamine, use the offense level determined by the entire weight of the mixture or

substance or the offense level determined by the weight of the pure ... methamphetamine, whichever is greater.[1]

*Guidelines Manual,* § 2D1.1 (emphasis added).

The defendants contend, on the other hand, that including the entire amount of the mixture is irrational in this case for three reasons: (1) defendants argue that the government failed to prove that any methamphetamine was actually present in the mixture; (2) that had the manufacturing been allowed to progress to completion, a much smaller amount of pure methamphetamine would have actually been produced; (3) that the mixture, in the form in which it was found, contained only a small amount of methamphetamine along with unreacted chemicals and by-products both of which are poisonous if ingested.

Defendants' first reason is clearly meritless in light of our unfavorable resolution of their earlier, identical argument. Reasons number two and three, however, give us greater pause. We note at the outset that the government is certainly not without precedent to support the district court's decision to use the entire mixture in sentencing. *See, e.g., United States v. Callihan,* 915 F.2d 1462, 1463 (10th Cir.1990) (mixture weighing 94 kilograms was used to determine base offense which contained only 2.95 kilograms of phenyl-2-propanone; the remaining mixture was unreacted chemicals and by-products); *United States v. Touby,* 909 F.2d 759, 773 (3d Cir.1990) (court included total weight of a 2.7% pure 100 gram "slab" of Euphoria), *aff'd on other grounds,* 500 U.S. ——, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991); *United States v. Mueller,* 902 F.2d 336, 345 (5th Cir.1990) (court sentenced defendant on the basis of weight of total mixture on similar facts); *United States v. Baker,* 883 F.2d 13, 15 (5th Cir.) (court included total weight of whole solution (40 lbs.) even though most of the liquid was waste), *cert. denied,*

---

**1.** As amended, effective November 1, 1989. For a discussion of the earlier footnote accompanying this section, see *United States v. Baker,* 883 F.2d 13 n. 1 (5th Cir.), *cert. denied,* 493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989). The version of the guidelines in effect at the time of

sentencing is ordinarily applied. *See* 18 U.S.C. § 3553(a)(4) and (5); S.Rep. No. 225, 98th Cong., 1st Sess. 77–78 (1983); *see also United States v. Williams,* 940 F.2d 176, 181 (6th Cir. 1991).

493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989).

Recently, in *Chapman v. United States,* — U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the Supreme Court settled the controversy as to whether the blotter paper customarily used to distribute LSD is a "mixture or substance containing a detectable amount" of LSD by concluding that it was. *Id.* 111 S.Ct. at 1925.[2] In so holding, the Court rested its opinion in large measure on the structure of the statute. Specifically, the Court noted that:

> Congress adopted a "market-oriented" approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence. To implement that principle, Congress set mandatory minimum sentences corresponding to the weight of a "mixture or substance containing a detectable amount of" the various controlled substances.... It intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level. Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going.

*Id.* (citations omitted). *See also United States v. Elrod,* 898 F.2d 60, 62 (6th Cir.) (per curiam), *cert. denied,* — U.S. ——, 111 S.Ct. 104, 112 L.Ed.2d 74 (1990).

At first blush, this then would appear to be an easy case. The plain language of the statute directs that the total weight of any mixture containing a detectable amount of methamphetamine be used for sentencing; there is no question that the contents of the Crockpot was a "mixture" that contained a detectable amount of methamphetamine. However, interpreting the statute to require the inclusion of the entire contents of the Crockpot for sentencing in this

case would both produce an illogical result and be contrary to the legislative intent underlying the statute. We decline to sanction such a result and therefore remand this case to the district court for resentencing. *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982) (interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available).

The record indicates that both the government and the district court assumed that because the contents of the Crockpot contained a detectable amount of methamphetamine the entire weight of the mixture was appropriately considered for sentencing. Ordinarily, this would be a safe assumption. If, however, the "mixture" in the Crockpot contained a small amount of methamphetamine and *poisonous* by-products not intended for ingestion, as the defendants contend, this assumption is unwarranted. The uncontradicted testimony of the government's chemist established that, had the defendants been successful in completely reacting the chemicals in the Crockpot, they would have produced a much smaller amount of pure methamphetamine. It seems fortuitous, and unwarranted by the statute, to hold the defendants punishable for the entire weight of the mixture when they could have neither produced that amount of methamphetamine nor distributed the mixture containing methamphetamine. Admittedly, the district court does have authority to make an upward departure under the Sentencing Guidelines if the defendant is found in possession of a mixture of unusually high purity, *Guidelines Manual,* § 2D1.1, comment. (n.9), and therefore the defendants in this case could be subject to the same sentence if the district court used the amount they were capable of producing and then departed upward based upon the fact that the end product would presumably be pure methamphetamine. *See Baker,* 883 F.2d at 15. The fact that the defendants *could* be sub-

---

**2.** For an example of this difference of opinion compare the Seventh Circuit's majority opinion

in *United States v. Marshall,* 908 F.2d 1312 (7th Cir.1990), with that of the dissent, *id.* at 1326.

ject to the same sentence does not, however, authorize the district court from using an inappropriate procedure in reaching that sentence.

More importantly, using the entire weight of the contents of the Crockpot in this case would not be in keeping with the legislative intent underlying the sentencing scheme established by Congress. As *Chapman* makes clear, "Congress clearly intended the dilutant, cutting agent, or carrier medium to be included in the weight of those drugs for sentencing purposes. Inactive ingredients are combined with pure [forms of the illegal drug], and the mixture is then sold to consumers as a heavily diluted form of the drug." *Id.* 111 S.Ct. at 1924. By diluting the drug with some other substance, the distributor is increasing the amount of the drug he has available to sell to consumers and therefore is appropriately subject to punishment for the entire weight of the mixture. Such is clearly not the case here. If the Crockpot contained only a small amount of methamphetamine mixed together with poisonous unreacted chemicals and by-products, there would have been no possibility that the mixture could be distributed to consumers. At this stage of the manufacturing process, the defendants were not attempting to increase the amount of methamphetamine they had available to sell by adding a dilutant, cutting agent, or carrier medium, but rather were attempting to distill methamphetamine from the otherwise uningestable byproducts of its manufacture.

Because the record is not adequately developed with respect to the contents of the Crockpot, we feel that remand is necessary in order for the district court to conduct an evidentiary hearing on this issue. If, as we suspect, the defendants are correct in their assertions as to the chemical properties of the contents of the Crockpot, it would be inappropriate for the district court to include the entire weight of the mixture for sentencing purposes. Instead, the district court would be limited to the amount of methamphetamine the defendants were capable of producing. *See Guidelines Manual,* § 2D1.1, comment. (n.12); *United*

*States v. Smallwood,* 920 F.2d 1231 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2870, 115 L.Ed.2d 1035 (1991); *United States v. Putney,* 906 F.2d 477 (9th Cir. 1990); *United States v. Evans,* 891 F.2d 686 (8th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2170, 109 L.Ed.2d 499 (1990). Because we believe that this conclusion is compelled by the legislative intent underlying the sentencing scheme of both the statute and the Sentencing Guidelines, we decline to follow those cases reaching an opposite conclusion.

We have carefully examined the defendants' remaining arguments and find them to be meritless.

Therefore, this case is remanded to the district court for further proceedings consistent with this opinion.