## STATE of Tennessee

### v.

## Kevin MAGNESS.

Court of Criminal Appeals of Tennessee, at Nashville.

July 21, 2004 Session.

Sept. 28, 2004.

Application for Permission to Appeal Denied by Supreme Court Jan. 14, 2005.

Petition to Rehear Denied Feb. 28, 2005.

Steven R. Roller, McMinnville, Tennessee, and Donald Capparella, Nashville, Tennessee, for the appellant, Kevin Magness.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Clement Dale Potter, District Attorney General; and Larry G. Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which NORMA McGEE Ogle and ROBERT W. WEDEMEYER, JJ., joined.

A Warren County Circuit Court jury convicted the defendant, Kevin Magness, of manufacturing more than one hundred grams of methamphetamine, a Class B felony, and the trial court sentenced him as a Range I, standard offender to eight years in confinement. The defendant appeals, claiming that (1) the evidence is insufficient to support his conviction, and (2) the trial court erred by allowing into evidence the manner by which the state calculated the weight of the substance containing methamphetamine. We hold that the evidence is sufficient to show felonious manufacturing but that an incorrect standard was used to calculate the weight of the controlled substance. We modify the defendant's conviction to reflect a conviction for a Class C felony, and we remand the case to the trial court for resentencing.

This case relates to the defendant's manufacturing methamphetamine on June

12, 2002. At trial, Warren County Sheriff's Deputy Stewart Caldwell testified that he received a tip that the defendant was operating a methamphetamine laboratory ("meth lab") at his house on Old Shelbyville Road. He said that he and Warren County Sheriff's Deputy Kevin Murphy decided to investigate by driving to the defendant's house. Deputy Caldwell testified that they drove into the defendant's driveway, parked, and approached the house. He said the defendant came out of his house and asked them why they were there. Deputy Caldwell said he explained to the defendant that he had received information that someone at the defendant's address was manufacturing methamphetamine and asked the defendant for permission to search the premises. He said the defendant consented to the search.

Deputy Caldwell testified that they went to the defendant's barn and began to search. He said he found a "large garbage bag containing trash from a meth lab" as soon as he began to search. He said the trash consisted of "brake cleaner and coffee filters that were stained." Deputy Caldwell testified that they stopped the search upon finding what they believed to be evidence of a meth lab.

Deputy Murphy testified that when they stopped the search, he advised the defendant of his *Miranda* rights and that, upon their request, the defendant signed a consent form allowing the deputies to continue searching the barn. Deputy Murphy said that after the defendant consented in writing, other law enforcement officers arrived at the defendant's home to conduct the search. He said that during the search, he found layered liquids of what he believed to be iodine.

Deputy Murphy testified that he had been responsible for the evidence log during the search of the barn. He said many different items were found during the search which are used in the process of manufacturing methamphetamine. He testified that these items included (1) a jar containing a layered liquid, (2) two twenty ounce bottles containing layered liquids, (3) iodine crystals, (4) Red Devil lye, (5) a respirator, (6) a tea jug containing red residue, (7) "several matchbooks with striker pads missing," (8) stained coffee filters, (9) a chemical suit, (10) rubbing alcohol, (11) cans of brake cleaner, and (12) an exhaust system. He testified in meticulous detail as to how each of these items is used in order to manufacture methamphetamine.

Warren County Sheriff's Department Lieutenant Jody Cavanaugh testified that he obtained a search warrant in order to search the defendant's house and that the search of the house revealed over four hundred eighty diet and sinus pills containing pseudoephedrine, a substance critical to manufacturing methamphetamine. Lieutenant Cavanaugh also explained how the items discovered in the barn were used in the methamphetamine manufacturing process.

Warren County Sheriff's Deputy Daniel Chisam testified that he was involved in the investigation of the defendant's barn. He said he had received meth lab investigation and interdiction training from the Drug Enforcement Administration at a week-long program in Quantico, Virginia. He said that as a result of this enhanced training, he was certified to investigate "clandestine meth labs." He also testified as to how the items discovered in the barn and in the house are used in the methamphetamine manufacturing process. On cross-examination, Deputy Chisam conceded that only one of the three bottles found in the barn tested positive for methamphetamine and that the bottle which did test positive lacked one step from being completed in order for the drug to be

capable of being consumed. Deputy Chisam said the layered bottle would have to "be gassed off, using muriatic acid or salt." He explained, "What this gas does is evaporate the brake cleaner and turn the liquid into a powder." Deputy Chisam also conceded that there was no way of knowing for certain how much methamphetamine would result after the final step was completed and that until the final step was completed, the drug could not be ingested.

David Brown of the Tennessee Bureau of Investigation, Forensic Services Division testified that he tested the substances sent to him by the Warren County Sheriff's Department. Agent Brown said that the testing revealed one of the substances contained methamphetamine and that the total weight of the substance containing methamphetamine was 101.1 grams. On cross-examination, Agent Brown acknowledged the substance containing methamphetamine was not consumable until the brake cleaner was removed.

The defendant testified that he had made methamphetamine in the past for his own personal use because he did not want to die from using methamphetamine manufactured by someone else. He said that he was not currently using or making methamphetamine and that the items recovered from his barn were either related to his work or they were "from other people doing it." The defendant denied ever making methamphetamine in his barn, and he said he did not know how the substance containing methamphetamine got into his barn.

The jury convicted the defendant of manufacturing methamphetamine over one hundred grams. After finding no applicable enhancement factors, the trial court sentenced the defendant to a term of eight years in the Department of Correction, the presumptive minimum sentence for a Range I, standard offender convicted of a Class B felony.

## I. SUFFICIENCY OF THE EVIDENCE

## [REDACTED FROM PUBLISHED OPINION]

## II. WEIGHING A SUBSTANCE CONTAINING METHAMPHETAMINE

■ The defendant claims that the trial court erred by allowing the state to admit into evidence the weight of the substance containing methamphetamine as 101.1 grams. He claims this was error because brake cleaner was included with the methamphetamine in the substance which TBI Agent Brown tested. The defendant argues that this impermissibly increased the weight of the substance containing methamphetamine because it rendered the substance unmarketable and requests this court to apply the "market-oriented" approach to Tennessee Code Annotated section 39–17–417 in order to determine the weight of a substance containing methamphetamine. The defendant claims that this issue presents a question of first impression in Tennessee.

The state has urged that we look to the plain meaning of the statute and conclude that the term "substance containing" applies to the mixture of brake cleaner and methamphetamine. The statute provides that a person who knowingly manufactures "one hundred grams or more of any *substance containing* amphetamine or methamphetamine" is guilty of a Class B felony. T.C.A. § 39–17–417(i)(10) (emphasis added). The state argues the plain meaning of this section allows it to include in its calculation the weight of the brake cleaner fluid, provided that a detectable amount of methamphetamine is present.

"A basic principle of statutory construction is to ascertain and give effect to legislative intent without unduly restricting or expanding the intended scope of a statute." *Parks v. Tennessee Mun. League Risk Management Pool*, 974 S.W.2d 677, 679 (Tenn.1998) (citing *Owens v. State*, 908 S.W.2d 923, 926 (Tenn.1995)). However, if the statutory language is ambiguous "courts must look to the statutory scheme as a whole, as well as legislative history, to discern its meaning." *Parks*, 974 S.W.2d at 679 (citing *Owens*, 908 S.W.2d at 926). If the plain meaning of a statute is applied in specific situations so as to produce an absurd or incongruous result, the intent of the General Assembly will prevail over the statutory language. *See Barnett v. Barnett*, 27 S.W.3d 904, 909 (Tenn.2000) (citing *Business Brokerage Centre v. Dixon*, 874 S.W.2d 1, 5 (Tenn. 1994)).

When the fair import of the language of a penal statute, in the context of the legislative history and case law on the subject, still results in ambiguity, the rule of strict construction would apply to limit the statute's application to those persons or circumstances clearly described by the statute. *State v. Horton*, 880 S.W.2d 732, 735 (Tenn.Crim.App.1994). In other words, "[t]he rule of lenity is a tie-breaker when there is an otherwise-unresolved ambiguity." *United States v. White*, 888 F.2d 490, 497 (7th Cir.1989). This rule is more than one of convenience. The application of strict construction by which ambiguities in a penal statute are construed in favor of lenity "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate ... whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979); *accord State v. Richmond*, 171 Tenn. 1, 100 S.W.2d 1, 3 (1937).

We begin our statutory interpretation by looking to the definition of the words "substance containing" in order to determine whether the plain meaning of that phrase allowed the state to weigh the methamphetamine along with the brake cleaner. "Substance" is defined as "physical material which has discrete existence" or "matter of a definite chemical composition." *Webster's Collegiate Dictionary* 1174 (10th ed.1996). "Contain" is defined as "to hold together, hold in," "to keep within limits," or "to have within." *Id.* at 249.

While the state contends the statutory language "substance containing" is plain and unambiguous, we note that federal courts interpreting the identical phrase codified in the Federal Comprehensive Drug Abuse Prevention and Control Act failed to achieve a consensus on this very issue. *See cert. denied Fowner v. U.S.*, 504 U.S. 933, 112 S.Ct. 1998, 118 L.Ed.2d 594 (1992) (White, J., dissenting) (recognizing the circuit split on the interpretation of "substance containing"). For example, in *United States v. Mahecha–Onofre*, 936 F.2d 623 (1st Cir.1991), an airline passenger was arrested at an airport after a search revealed that his briefcase's acrylic lining had cocaine chemically attached to it. The trial court weighed the entire briefcase minus its metal parts in arriving at the appropriate sentence. On appeal, the first circuit held that the plain meaning of the phrase "substance containing" justified the trial court in weighing the entire suitcase along with the cocaine in order to calculate the defendant's sentence under the Federal Sentencing Guidelines. 936 F.2d at 624–26; *accord United States v. Restrepo–Contreras*, 942 F.2d 96 (1st Cir. 1991) (holding the entire weight of a statue made of cocaine and beeswax could be included for sentencing). On the other hand, in *United States v. Jennings*, 945

F.2d 129, 136–37 (6th Cir.1991), the court held that "interpreting the statute to require the inclusion of the entire contents of the Crockpot [containing methamphetamine and unreacted poisonous chemicals] for sentencing ... would both produce an illogical result and be contrary to the legislative intent underlying the statute." 945 F.2d at 136 (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982)).

Although the state believes that the language in Tennessee Code Annotated section 39–17–417 is clear and unambiguous, we note that the phrase "substance containing" was sufficiently ambiguous to create a split of authority among the federal appellate courts. We agree with the *Jennings* court and believe that the state's literal interpretation approach to the phrase "substance containing" could produce illogical and absurd results. We conclude that in order to answer the question of the proper method for weighing a "substance containing" methamphetamine, we must look to the process by which our state has enacted, modified, and amended the Tennessee Drug Control Act relative to changes in federal drug laws.

In 1970, Congress passed the Comprehensive Drug Abuse Prevention and Control Act, a statute designed to rationalize federal drug laws. *See* Pub.L. 91–513, Title II, § 401 (1970); 1970 U.S.C.C.A.N. 4566; *accord The Nat'l Org. for the Reform of Marijuana Laws (NORML) v. Drug Enforcement Admin.*, 559 F.2d 735, 737 (D.C.Cir.1977). The legislative history of the act indicates that Congress intended to limit commercial trafficking in narcotics. *See Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 688, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974); 116 Cong. Rec. 1665 (1970) (remarks by Senator Hruska).

In 1971, the Tennessee General Assembly passed the Tennessee Drug Control Act "to provide for a comprehensive system of drug abuse control for Tennessee." 1971 Tenn. Pub. Acts ch. 163. The legislation passed by the General Assembly was modeled on the Uniform Controlled Substances Act which was drafted in order "to achieve uniformity between the laws of the several states and those of the federal government." Unif. Controlled Substances Act, 9 (Part II) U.L.A. 2. *Compare* Pub.L. 91–513, Title II, § 401, *with* 1971 Tenn. Pub. Act. ch. 163.

In 1984, 1986, and 1988, Congress amended the Drug Abuse Prevention and Control Act of 1970. Pub.L. 100–690, Title VI, §§ 6055, 6254(h), 6452(a), 6470(g), (h), 6479 (1988); Pub.L. 99–570, Title I, §§ 1002, 1003(a), 1004(a), 1005(a), 1103 (1986); Pub.L. 98–473, Title II, §§ 224(a), 502, 503(b)(1), (2) (1984). These amendments focused on ensuring that federal drug laws would impose penalties based upon the seriousness of the offense, reserving the most serious penalties for those who were commercial traffickers of large quantities of illegal drugs. In 1989, Tennessee also reformed its criminal laws, including the Drug Control Act, to punish offenders more uniformly based upon the seriousness of the offense. *See* 1989 Tenn. Pub. Acts. ch. 591, at 1254–79.

In the 1989 act, the Tennessee General Assembly provided that if any controlled substance was "designated, rescheduled, or deleted as a controlled substance under federal law ..., the commissioner, upon agreement of the commissioner of health, shall similarly control the substance" under Tennessee law. T.C.A. § 39–17–403; 1989 Tenn. Pub. Acts. ch 591, at 1257–58. Moreover, this court has noted that Tennessee's Drug Control Act "was enacted to compliment ... federal laws regarding drug control...." *State v. Frank Mon-*

*giove,* No. 115, Sevier County, slip op. at 12, 1991 WL 9036 (Tenn.Crim.App. Jan. 31, 1991); *see also Hughes v. State, Department of Safety,* 776 S.W.2d 111 (Tenn. Ct.App.1989) (noting that the 1986 amendment of the General Assembly "intended to . . . make the state law the same as the federal [drug] forfeiture statutes").

Currently, the relevant Tennessee and federal statutes contain identical language for determining the method by which trial courts are to weigh methamphetamine, using the phrase "substance containing . . . methamphetamine." *Cf.* 21 U.S.C.A. § 841(b)(1)(A)(viii) (proscribing penalties for "500 grams or more of a mixture or *substance containing* a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers") (emphasis added); T.C.A. § 39–17–417(i)(10), (j)(10) (proscribing penalties for respectively 100 and 1000 grams or more of "any *substance containing* amphetamine or methamphetamine or any salt or optical isomer of amphetamine or methamphetamine") (emphasis added). Concluding that Tennessee's illegal drug laws were enacted to mirror the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970, we look to how Congress and the federal courts have resolved the issue presented by the defendant.

*Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), is the seminal case concerning the method of weighing substances containing illegal drugs in order to determine the appropriate punishment range for a defendant accused of violating federal drug laws. In *Chapman,* the Supreme Court held that the proper method for weighing lysergic acid diethylamide ("LSD") made commercially marketable by placing small amounts of the drug on a carrier medium, blotter paper, was to include the blotter paper when weighing the substance. The Court

focused on the legislative history of federal illegal drug laws. The Court first noted that the 1984 amendments to the Federal Comprehensive Drug Abuse Prevention and Control Act were enacted "to provide a more rational penalty structure for the major drug trafficking offenses." Turning to the legislative history of the 1986 amendments, the Court found Congress had "adopted a 'market-oriented' approach to punish drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." In concluding that the trial court had properly included the weight of the blotter paper in affixing the defendant's sentence, the Court held,

> By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity. That is a rational sentencing scheme.

*Chapman,* 500 U.S. at 459–65, 111 S.Ct. 1919 (citing H.R.Rep. No. 99–845, pt. 1, pp. 11–12, 17 (1986); S.Rep. No. 98–225, at 255 (1983), 1984 U.S.C.C.A.N. 3182, 3437).

The lower federal courts applying *Chapman* split on the issue presented for review in this case; namely, whether trial courts should also include toxic substances and substances that have to be removed from a mixture before the illegal drug can be sold or marketed. In *Jennings, supra,* the sixth circuit applied the "market-oriented" approach of *Chapman.* The defendant in *Jennings* was convicted of manufacturing methamphetamine over 4000 grams. The methamphetamine seized by the government was combined with unreacted chemicals and had not completed

the "cooking" process. The court noted that the mixture or "substance containing" methamphetamine contained poisonous substances which could not be ingested by potential methamphetamine users. The court focused its analysis on the "market oriented" approach and held that unreacted, poisonous chemicals could not be combined for purposes of weighing the methamphetamine because such a substance was not consumable or marketable. 945 F.2d 129, 136–37 (6th Cir.1991).

However, the fifth circuit in *United States v. Sherrod*, 964 F.2d 1501 (5th Cir. 1992), arrived at a contrary result. In *Sherrod*, the defendant was convicted of manufacture of methamphetamine in excess of one kilogram. The defendant appealed claiming the trial court erred by allowing the government to weigh the entire mixture or substance containing methamphetamine, which was found in three separate containers combined with unreacted chemicals. In sustaining the defendant's conviction and resulting sentence, the fifth circuit distinguished *Chapman* and stated that Congress did not intend to apply the "market oriented" approach to methamphetamine. The court noted Congress had treated methamphetamine different from cocaine and heroine by providing for varying weight amounts based upon whether the methamphetamine was in a pure or diluted form. The court held that it was proper for the trial judge to weigh the unreacted chemicals and the methamphetamine together in order to calculate the defendant's sentence under the guidelines. 964 F.2d at 1509–10.

We disagree with the fifth circuit's analysis of *Chapman*. The Supreme Court distinguished methamphetamine from cocaine and heroine in *Chapman* to buttress its argument that Congress intended carrier agents and mediums to be included for purposes of weighing cocaine and heroine. The Court compared the statutory language and concluded that because Congress had provided for different weights based upon pure or diluted forms of methamphetamine and because it did not similarly differentiate between pure and diluted forms of cocaine and heroine, Congress intended for carrier agents and mediums to be included in calculating the weight of those substances. Unlike the fifth circuit, we believe this analysis supports the proposition that the substance must be *marketable* or *consumable* in order to weigh it.

Before the Supreme Court chose to resolve the split among the lower courts, the Sentencing Guideline Commission amended section 2D1.1 of the federal sentencing guidelines entitled "Application Notes" as follows:

1. "Mixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided. *Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used.* ... If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted.

U.S.S.G.App. C., Amend. 484 (1993). After the implementation of Amendment 484, the lower federal courts began to apply the new "Application Note," thereby preventing the government from calculating a defendant's sentence based upon "materials that must be separated from the controlled substance before the controlled substance can be used." *See United States v. Levay*, 76 F.3d 671, 673–74 (5th Cir.1996) (holding pursuant to Amendment 484 that wastewater and precursor chemi-

cals cannot be included when calculating the weight of an illegal drug under the federal sentencing guidelines); *accord United States v. Stewart,* 361 F.3d 373, 382 (7th Cir.2004) (holding "that only usable or consumable mixtures or substances can be used in determining drug quantity under § 841(b)"); *United States v. Sprague,* 135 F.3d 1301, 1306 (9th Cir.1998) (holding that under the guidelines, the government cannot include the weight of substances that must be removed before the solution containing methamphetamine can be consumed).

While the method by which our General Assembly has enacted, modified, and amended the Tennessee Drug Control Act in relation to federal drug laws provides persuasive authority that its intent was to follow the market oriented approach, we note that this court has already addressed this issue. In *State v. Ash,* 729 S.W.2d 275 (Tenn.Crim.App.1986), the defendant was convicted "of possession of a substance containing more than five grams of LSD." On appeal, the defendant contended that the phrase "substance containing" was impermissibly vague. This court, in affirming the conviction stated,

> Given the nature of the drug LSD, it is necessary that the statute not require a particular weight of the pure substance. LSD is rarely, if ever, sold in the "street" marketplace in its pure form. It is ordinarily sold in tablets, on dots of paper, or on some other agent. The dosage is measured in micrograms. Thus, it would be impossible to define with any precision the exact weight of pure LSD which constitutes criminal possession. Rather, it is the weight of the *substance (agent)* that can be defined, and the legislature has done so in the statute.

729 S.W.2d at 280 (emphasis added). This court in *State v. Alcorn,* 741 S.W.2d 135 (Tenn.Crim.App.1987), addressed a nearly identical issue in the context of cocaine when the defendant appealed his conviction for possession of a substance containing cocaine that was only 32.1 percent pure. This court cited *Ash* with approval stating, "Similar issues were raised in [*Ash* where] we concluded that given the usual forms in which the drug is *marketed* and *consumed,* the phrase 'any substance containing LSD' refers to the agent that contains LSD as well as the pure form of the drug...." The defendant, however, asserted that the statute was impermissibly vague because, he argued, cocaine would almost always be "contained in, or enclosed by, some other object (a bag, a fruit jar, even an automobile)" that would exceed the statutory weight. This court rejected the defendant's argument stating, "The defendant[ ] may not rely on possible applications that did not occur in this case.... Moreover, our construction of the statute would seem to preclude such possibilities." This court then held that a "carrier medium" can be included with the pure cocaine when calculating the weight of "any substance containing cocaine." 741 S.W.2d at 137–38 (emphasis added).

We believe Tennessee has adopted a "market-oriented" approach based upon this court's precedents and the method by which our General Assembly has modified and amended the Tennessee Drug Control Act in relation to federal drug laws. Based upon *Alcorn* and *Ash,* and the rule of lenity, we conclude that the brake cleaner seized by the state was neither consumable nor marketable and that the nonprecursor, toxic substance used in the manufacturing process was impermissibly weighed with the methamphetamine.

Although the evidence cannot sustain the defendant's conviction for Class B felo-

ny manufacture of methamphetamine over 100 grams, it is sufficient to support a conviction for Class C felony manufacture of methamphetamine. We modify the defendant's conviction to a Class C felony and remand the case to the trial court for resentencing.