IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2024 Session

## STATE OF TENNESSEE v. CHRISTOPHER ALLEN KEYT

**Appeal from the Criminal Court for Monroe County**
**No. 20-049    Sandra Donaghy, Judge**
_____

**No. E2024-00046-CCA-R3-CD**
_____

Defendant, Christopher Allen Keyt, was convicted by a Monroe County jury of possession with the intent to sell or deliver 0.5 grams or more of methamphetamine (count one) and possession of a firearm during the attempt to commit a dangerous felony (count two). The trial court sentenced Defendant to thirteen years for count one and four years for count two, to run consecutively. Defendant appeals, arguing that the trial court erred by denying a motion to suppress evidence seized pursuant to a search warrant, that the evidence was insufficient to support his convictions, that the trial court erred in qualifying a detective as an expert in the methamphetamine trade in Monroe County, and that the trial court erred by restricting Defendant's questioning of the detective. Upon review of the entire record, the briefs and oral arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Christopher Allen Keyt.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Stephen Hatchett, District Attorney General; and Shari Lynn Tayloe, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

This case arose when two confidential informants made a narcotics investigator aware that Defendant was selling methamphetamine out of a residence in Monroe County.

Based on the information provided by the informants and his independent investigation, the investigator obtained and executed a search warrant for Defendant and the residence. The search yielded a substance later confirmed to be methamphetamine and $1,600 cash. Although not the subject of the search warrant, a vehicle parked in front of the residence was also searched after the officer observed a gun in plain view, and officers retrieved a 9mm gun and two digital scales.

A Monroe County Grand Jury entered a true bill indicting Defendant for possession with the intent to sell 0.5 grams or more of methamphetamine, a Class B felony, and possession of a firearm during the commission of or attempt to commit a dangerous felony. Defendant filed a pretrial motion to suppress the evidence seized during the execution of the warrant.

*Search Warrant Affidavit*

Dalton Rinehart, a detective and narcotics investigator in the Monroe County Sheriff's Office ("MCSO") prepared the June 18, 2019 affidavit in support of the search warrant which when issued, allowed officers to search Defendant and a one-story partial brick residence on Fire Department Road in Sweetwater. At the time he prepared the affidavit, Detective Rinehart had been employed in law enforcement since 2012 and had worked as both a corrections officer and a patrol officer, before being assigned to the Monroe County Narcotics Unit. In the affidavit, Detective Rinehart detailed his education, training, and experience in narcotics investigations and described how, based on his experience, drug traffickers store and distribute controlled substances. He also explained that drug traffickers "keep firearms on hand to protect their person[,] drugs and money as well as large amounts of currency to finance their ongoing narcotics business[.]"

In applying for the search warrant, Detective Rinehart obtained information from two confidential sources of information ("SOI") regarding Defendant's selling of methamphetamine. As set out in paragraph 4 of the affidavit, SOI-1 informed Detective Rinehart that "[w]ithin the past [twelve] months," SOI-1 had "observed [Defendant] in possession of [m]ethamphetamine in Monroe County" and that Defendant "sells [m]ethamphetamine."

Paragraphs 5 and 6 of the affidavit detailed information provided by SOI-2. Within seventy-two hours of the date of the affidavit, SOI-2 had observed Defendant selling methamphetamine in the Fire Department Road residence where SOI-2 believed Defendant lived. According to SOI-2, Defendant was in possession of "multiple ounces of ice [m]ethamphetamine inside the residence."

Regarding SOI-2, Detective Rinehart stated the following in the affidavit:

- 2 -

SOI 2 is a credible and reliable source of information. SOI 2 has participated in multiple prior controlled substance buys helping myself, and other officers with investigations of other individuals for drug related crime. Information provided by SOI 2 has led to the arrest of no less than [six] individuals for drug related crime, along with the conviction of at least three individuals for drug related crime. Information given by SOI 2 has led to the discovery of illegal controlled substances, drug paraphernalia, and drug proceeds including Methamphetamine, Marijuana, various types of prescription drugs, digital scales, pipes used for ingesting controlled substances, needles, and currency. SOI 2 has never provided me with information that has been proven false, and information given by SOI 2 has been able to be proven true consistently.

Based on the information provided by SOI-1 and SOI-2, and his training and experience in narcotics investigations, Detective Rinehart requested a warrant to search Defendant and the Fire Department Road residence.

*Suppression Hearing – March 26, 2021*

At the hearing on Defendant's motion to suppress, Detective Rinehart detailed his law enforcement experience and testified that Defendant was the subject of an investigation based on information provided by confidential sources and his observation of Defendant. On June 18, 2019, he submitted his affidavit and warrant to the General Sessions Court judge who reviewed and signed the warrant. The warrant and supporting affidavit were exhibited to his testimony.

Detective Rinehart explained that the first three paragraphs of the affidavit detailed his training and experience as a law enforcement officer. Paragraph four concerned the information provided by SOI-1. Paragraph five detailed that SOI-2 observed Defendant selling illegal narcotics and conveyed where Defendant was selling it and how much he was selling. Paragraph six detailed the credibility and reliability of SOI-2.

After the warrant was issued, Detective Rinehart waited "a couple of days" and then gathered a team of officers to execute the warrant. However, prior to executing the warrant, Detective Rinehart surveilled the residence from the woods across the road to confirm that Defendant was there while the search team waited in a nearby location. Detective Rinehart observed Defendant going back and forth from the residence to a tan sport utility vehicle ("SUV") parked in the front yard. He did not observe anyone other than Defendant going to and from the residence and the SUV. According to Detective Rinehart, Defendant did this "[a]t least three times."

- 3 -

Once Detective Rinehart confirmed that Defendant was at the residence, he called the team, and they executed the warrant. Defendant was detained inside the residence. Detective Rinehart searched Defendant and found in his left front pants pocket a bag of a crystal substance that appeared to be methamphetamine and $1,600 cash. At some point, Detective Rinehart looked through the front driver side window of the SUV and saw the butt of a gun sticking up between the driver seat and the center console.

Detective Rinehart advised Defendant of his *Miranda* rights and explained that he usually read the warning from a screenshot on his phone or a card he carried so he "do[esn']t mess it up." Defendant waived his rights and agreed to be interviewed. He told Detective Rinehart that he had borrowed the SUV from someone, that the gun in the SUV did not belong to him, but that his fingerprints would "probably" be on it. Defendant admitted to selling methamphetamine.

A search of the SUV yielded two sets of digital scales and a 9mm firearm. Exhibited to Detective Rinehart's testimony was a photograph of the firearm visible from outside the SUV; Detective Rinehart took the photograph before searching the SUV. Because Detective Rinehart was familiar with Defendant's criminal history, he knew Defendant was prohibited from possessing a weapon.

On cross-examination, Detective Rinehart acknowledged that he did not include Defendant's prior record or a request to search the vehicle in the affidavit for the warrant. Detective Rinehart clarified that he searched the SUV before Defendant was interviewed; Defendant did not consent to a search of the SUV. Detective Rinehart had seen Defendant drive the SUV but did not include that observation in the affidavit. He had taken information from the license plate but did not recall who owned the SUV. He knew that it was not registered to Defendant but could not recall whether it was registered to Jamie Paul, who was at the residence at the time of the search and found with a methamphetamine pipe. The pipe was confiscated, but Ms. Paul was not charged with possession of drug paraphernalia. Detective Rinehart agreed that he confirmed Defendant did not own or rent the residence that was searched; he knew only that Defendant was staying there.

Detective Rinehart agreed that the affidavit did not contain information concerning the reliability of SOI-1 and that the only information that Defendant sold drugs out of the Fire Department Road residence was provided by SOI-2. Detective Rinehart stated that the warrant was executed two and a half days after it was obtained, approximately five and a half days after SOI-2's observation of Defendant in the residence. Although the affidavit did not mention whether SOI-2 bought methamphetamine from Defendant, Detective Rinehart testified that both SOIs had completed "multiple prior buys involving drugs."

On the return of the warrant, Detective Rinehart noted that Defendant was in possession of "fake" money. When asked whether the fake money was part of the currency found on Defendant, Detective Rinehart explained that the fake money was movie prop money, not counterfeit money, and had been separated from the currency of $1,600. He recalled that there was "only a couple hundred dollars" of the fake money.

Detective Rinehart did not ask Defendant to sign a written waiver form. He reiterated that Defendant verbally consented to talk to him after he read Defendant his rights.

The trial court denied the motion to suppress accrediting Detective Rinehart's testimony regarding his investigation and application for the search warrant. The trial court found that under the totality of the circumstances, there was probable cause for the search warrant and that the information provided by SOI-2 was not stale. The trial court also found that the search of the SUV was permissible under the plain view exception to the warrant requirement.

*Trial – June 3-4, 2021*

Detective Rinehart's trial testimony was consistent with his testimony at the hearing on the motion to suppress. He noted that from his surveillance, he observed the tan SUV in the front yard and that he had previously seen Defendant leave the residence driving the SUV. He had also observed Defendant going back and forth from the residence loading items into the SUV.

Once he verified that Defendant was at the residence, Detective Rinehart signaled to the tactical team to arrive to execute the search warrant. Detective Rinehart entered the residence after the tactical team placed the occupants under arrest and secured the residence. Detective Rinehart recalled that two women were in the residence in addition to Defendant and some children were playing outside. When Detective Rinehart entered the residence, Defendant was lying on the floor in a room in the back of the house with his arms handcuffed behind him. Detective Rinehart picked Defendant up from the floor, patted him down, and emptied his pockets. Defendant had a bag containing a crystal substance in his left front pants pocket, and his wallet contained approximately $1,600 cash and the fake money.

Detective Rinehart recorded his interview with Defendant but did not record his advising Defendant of his *Miranda* rights. He did not use the audio recorder on his phone to record the interview because he did not want the interview to be interrupted by a call. He instead used his pocket recorder. He described the failure to record the warning as "a mistake" and acknowledged that it should have been recorded. He explained that officers

deal with "dangers" when serving a search warrant with a tactical team. In addition to executing the search warrant and securing the premises, Detective Rinehart wanted to make certain the children at the residence were safe.

Detective Rinehart also explained that the part of the interview about the gun in the SUV occurred before he began recording. Detective Rinehart testified that he began recording the interview after he took Defendant outside. He searched the SUV after he finished talking to Defendant. The photograph taken from outside the vehicle showing the butt of a gun wedged between the driver seat and the center console was exhibited to his trial testimony. The gun, a loaded Jimenez 9mm, and the magazine were collected from the SUV and dusted for fingerprints. No fingerprints were lifted from the gun.

In addition to the gun, Detective Rinehart found two sets of digital scales in the SUV and observed a residual crystal substance in some of the cracks of the scales. He used one of the scales to weigh the crystal substance found in Defendant's front left pants pocket. He was not aware if the scales were calibrated for accuracy.

Detective Rinehart gave the seized items to the evidence technician except for the money which was turned over to the civil court.

The recording of Detective Rinehart's interview of Defendant was played for the jury. When Detective Rinehart asked Defendant how much of the drugs he had sold in the past week, Defendant stated a number under his breath which is not audible on the recording. In response to Detective Rinehart's questions about how often Defendant had sold drugs from the residence, Defendant said he had sold drugs once in the past ten days. Defendant told Detective Rinehart he had been trying to get a place for himself and his children and that once that was accomplished, he would be "done." He explained that selling half a gram "lasts him a week." Defendant insisted that he worked for the money found on him and that "none of it" was from selling drugs.

On the recording, Defendant asked Detective Rinehart what charges he was facing and whether there was a way to resolve the case. The next portion of the recording was clearly taken outside the residence because it is barely audible due to the sounds of traffic. Together, Detective Rinehart and Defendant counted the cash which totaled $1,633. When Detective Rinehart informed Defendant that the money would be seized, Defendant insisted that he earned the money from two weeks of legitimate work and that he received $700 from his brother and $500 from someone else. Defendant referred Detective Rinehart to his mother-in-law, with whom Defendant was living, and said she would vouch for the fact that he had been working to save up to find a home.

- 6 -

After the recording was played, Detective Rinehart described his training and experience in the investigation of methamphetamine trafficking:

Along with controlled buys on methamphetamine I've executed several search warrants where I've recovered methamphetamine. I've also assisted and conducted traffic stops where K9 sniffs resulted in finding methamphetamine [and] where consent searches have resulted in finding methamphetamine. I've even been to a clandestine laboratory school where we actually – the instructors actually cooked methamphetamine from start to finish. And the finished product was in powder form another type of methamphetamine. However, they also showed us, and I'm aware of how that is converted into crystal or ice methamphetamine similar to what I'm discussing today. I'm aware of ingredients. I'm aware of the cooking process. I'm aware of how it's ingested. I've interviewed hundreds of people that are . . . users. And I've also interviewed several people that have admitted to being methamphetamine dealers. And I've also dealt with people that are large-scale methamphetamine traffickers that have brought in kilos of methamphetamine into our county.

Detective Rinehart testified that he was "very familiar" with the drug trade in Monroe County and that his "sole job" was investigating narcotics trafficking. In his job, he interviewed informants about the price of methamphetamine and other illegal narcotics and talked to people about how controlled substances were entering Monroe County from neighboring counties and other countries. Detective Rinehart testified that methamphetamine was categorized by weight in grams, that a "40" constituted 0.4 grams for $40, that a "60" constituted 0.6 grams for $60, and that one gram sold for $100. He explained that methamphetamine greater than one gram was priced at "a wholesale or a discounted price" and that a larger amount, 3.5 grams or "an eightball" was typically sold for $150. Methamphetamine can be purchased in half ounces up to a pound. He added that "[t]he higher up that you're buying, the higher up in the drug trade that you are." He confirmed that the prices he mentioned were consistent with the ongoing rate at the time of the incident in 2019.

Detective Rinehart explained that "drug traffickers often keep certain items in their possession" much like a store will keep certain items "to help their trade[.]" Common items would be a measuring device to weigh the substance and packaging material to contain it. In 2019, drug trafficking was a "cash only sales" operation as opposed to using an app on a phone and that "street-level dealers" used cash. The State then offered Detective Rinehart as an expert in the drug trade in Monroe County during the period of the indictment. Over Defendant's objection, the trial court found that Detective Rinehart possessed specialized knowledge that would assist the trier of fact to understand the

evidence or determine a fact at issue and qualified him as an expert in the drug trade in Monroe County under Rules 701 and 702 of the Tennessee Rules of Evidence.

Turning to the evidence in the case, Detective Rinehart testified that the digital scales found in the SUV parked at the Fire Department Road residence were the type of scales he commonly found in his investigation of drug cases. He also testified that the packaging used to store the crystal substance found on Defendant was consistent with the type of plastic material commonly used to package controlled substances for sale and that the weight of the substance found on Defendant was inconsistent with personal use. The substance found on Defendant was worth approximately $1,100. He added that the amount of cash found on Defendant, by itself, would not mean anything for purposes of a drug investigation but that the amount of cash found on Defendant, coupled with the amount of drugs, suggested that the cash was the "receipt" for selling methamphetamine. As for the gun, Detective Rinehart found it to have "a large significance" because drug traffickers often used firearms to protect themselves from being robbed of their drug supply and "not because they're going to use them against the police[.]"

On cross-examination, Detective Rinehart "vividly" recalled seeing Defendant alone driving the tan SUV approximately one week before the execution of the search warrant. However, he could not recall the specific date or time of day. During the investigation, he had checked the registration of the SUV and knew Defendant was not the owner, but he could not recall to whom the SUV was registered.

On the day of the search, Detective Rinehart observed Defendant for approximately ten minutes sometime between 6:00-8:00 p.m. and again approximately thirty minutes before the warrant was executed. Detective Rinehart confirmed that Defendant was not the owner of the residence, but he was believed to be living there. The residence was rented by a woman named Tracey whose last name began with the letter "L." He did not recall her being present at the time of the search.

Detective Rinehart did not check with any federal agency to determine who owned the gun. On the day of the search, he did not see Defendant handle the gun or carry it back and forth between the SUV and the residence. Detective Rinehart testified that Defendant admitted to possessing the gun but not to owning it. He did not see Defendant carrying the digital scales or putting them in the SUV, and the scales were not dusted for fingerprints or tested for drug residue.

On the police report Detective Rinehart completed, he used Defendant's official address, a different residence in Sweetwater. Detective Rinehart did not search Defendant's official residence because it was not part of his investigation.

Detective Rinehart testified that he did not know how long the crystal substance had been in Defendant's pants. He gave the plastic bag with the crystal substance to the evidence custodian. He denied tampering with the crystal substance. He agreed that plastic sandwich bags were common packaging material for controlled substances, but none were found in this case.

During cross-examination, Defendant attempted to impeach Detective Rinehart with a letter from a confidential informant, and the State objected. During a jury-out hearing, Defendant argued that the letter, in which an informant who claimed to have worked with Detective Rinehart alleged that Detective Rinehart paid informants with drugs, would impeach Detective Rinehart's testimony about his experience with and use of informants. After reviewing the letter, the trial court ruled that it was inadmissible hearsay and was not relevant.

On redirect examination, Detective Rinehart clarified that he saw Defendant with items in his hand as he was coming out of the residence, not going in. He acknowledged that he should have turned on his recorder sooner, and he said his failure to do so was unintentional. He explained that "there's a lot going on" when executing a search warrant and that it takes a few minutes for the situation to calm down. He explained that there were only two narcotics investigators in the MCSO which covers "thousands of residents."

Detective Rinehart explained why he did not conduct further investigation of the gun:

> Because I had in my head developed that he was in possession of the firearm because he was aware of the firearm. I observed him [during] surveillance walking to and from the vehicle that the firearm was in and opening the driver's side door. And it was clear to me that there's no way you couldn't know about the firearm if you opened that door or even looked or glanced inside that window.

Deputy Angelina White Kelly, the MCSO evidence technician, testified that on June 21, 2019, she received into evidence a 9mm firearm with a magazine and nine rounds, a "baggie" containing a crystalline substance, two digital scales, a pipe, and fake money from Detective Rinehart. Once she sealed and documented the evidence, Deputy Kelly secured it in two separate rooms designated for narcotics and firearms in the MCSO until she transported the evidence to the Tennessee Bureau of Investigation ("TBI") on June 28, 2019. She testified that Detective Rinehart weighed the baggie containing the crystalline substance, but she did not see him do it. The scales had what appeared to be methamphetamine residue but were not sent for testing. She explained that scales are not normally tested.

Special Agent Hannah Peterson, a forensic scientist in the TBI forensic chemistry division testified as an expert in the field of forensic chemistry over Defendant's objection.[1] Agent Peterson testified that the crystalline substance she received weighed 11.33 grams. She weighed the substance without the packaging to get an accurate weight. After weighing the substance, she conducted a presumptive test and a confirmatory instrumental test. Agent Peterson explained that in a presumptive test, a chemical reactant is added to the substance. The resulting color or lack of color will indicate the kind of compounds in the substance. In this case, the substance changed to an orange color signifying the presence of a class of compounds often found in controlled substances. Next, Agent Peterson conducted a confirmatory test on the crystalline substance. She explained that a confirmatory test provides specific information about the structure of the compounds present in the substance which aids in its identification. She added that without the structural compound information, "there's no way to identify a substance." Although there are different kinds of confirmatory tests, in this case, Agent Peterson used an infrared spectroscopy which uses infrared light to change the molecules in the substance. The changes create a "spectra" comparable to a person's fingerprints. The resulting spectra is then compared to the standard spectra to determine whether there is a match. Agent Peterson testified that in this case, the confirmatory test showed that the crystalline substance was methamphetamine. She estimated that she had used the infrared spectroscopy "upwards" of 2,500 times and prepared an official chemistry report of the results of the two tests. She testified that less than half of the substance was tested and that generally she does not test all of the substance.

On cross-examination, Agent Peterson reiterated that she used "a few grains of crystals" or a residual amount to test. Specifically, she used less than 0.1 of a gram for testing which is the standard amount for testing. She explained that a larger amount is not necessary for the presumptive test. She could not recall how much of the substance she used for the confirmatory test but estimated that she used "a very small amount," or less than 0.1 of a gram. She did not reweigh the substance after she had completed her analysis.

Agent Peterson stated that she could not confirm whether the 11.33 grams submitted to her was "pure" methamphetamine because purity tests were not conducted at the TBI. The infrared spectroscopy tested for relative purity, and if a substance contained a lot of cutting agent or some other substance mixed in, the infrared spectroscopy would not work because of the competing mixtures. In this case, Agent Peterson was able to test the substance with the infrared spectroscopy because there were no competing substances or cutting agents.

---

[1] Defendant does not challenge Agent Peterson's testimony on appeal.

Defendant elected not to testify or offer any proof. The jury convicted Defendant as charged in count one of possession with the intent to sell or deliver 0.5 grams or more of methamphetamine and in count two with possession of a firearm during the attempt to commit a dangerous felony.

Following a sentencing hearing on December 9, 2021, the trial court sentenced Defendant as a Range II, Multiple Offender to thirteen years in the Department of Correction for possession with the intent to sell 0.5 grams or more of methamphetamine and four years for possession of a firearm during the attempt to commit a dangerous felony. *See* T.C.A. § 40-35-114(1), (8). By operation of law, the sentence for the firearm conviction ran consecutively to the sentence for the drug conviction, for a total effective sentence of seventeen years. *Id.* § 39-17-1324(a); (e)(1); (i)(1)(L).

Defendant filed a timely motion for new trial which was denied by the trial court at the conclusion of the hearing on the motion on December 6, 2023, and reduced to a written order entered March 14, 2024. Defendant filed his notice of appeal on January 5, 2024, before the entry of the written order on March 14, 2024. Defendant's notice of appeal, while premature, was timely filed. *See* Tenn. R. App. P. 4(d). Thus, Defendant's appeal is properly before this court.

**Analysis**

I. Motion to Suppress

Defendant claims that the trial court erred in denying his motion to suppress the items seized pursuant to the search warrant, arguing that the affidavit in support of the warrant failed to establish the veracity or basis of knowledge of the SOIs, failed to show a nexus between the drug dealing and the Fire Department Road residence, and failed to show facts supporting probable cause. Defendant also argues that the search of the SUV was unconstitutional because the warrant did not include the vehicle as the subject of the search. The State argues that the trial court properly denied the suppression motion because the warrant was timely and provided probable cause and that the gun was admissible because it was in plain view in the SUV. We agree with the State.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Green*, 697 S.W.3d 634, 640 (Tenn. 2024) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* (quoting *Odom*, 928 S.W.2d at 23). However, "the application of the law to the facts is a question of law that appellate courts review de novo with no presumption of correctness." *Id.* (quoting

*State v. Bell*, 429 S.W.3d 524, 529 (Tenn. 2014)); *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012)). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023) (quoting *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010)). Appellate courts may consider the proof adduced both at the suppression hearing and at trial in reviewing the correctness of a trial court's ruling on a pretrial motion to suppress. *Id.*

However, when a defendant seeks to suppress evidence on the sole basis that the issuing judge erred in finding probable cause to support the warrant, appellate courts "may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." *State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017) (quoting *State v. Henning*, 975 S.W.2d 290, 295 (Tenn. 1998)).

Probable cause is required to issue a warrant and involves non-technical probabilities relating to "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Green*, 697 S.W.3d at 643 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Probable cause determinations are "extremely fact-dependent." *Id.* (quoting *Bell*, 429 S.W.3d at 534). Appellate courts afford "great deference" to a magistrate's determination that probable cause exists to support the issuance of the search warrant. *Tuttle*, 515 S.W.3d at 300. The issuing judge uses a totality-of-the-circumstances analysis to determine whether the affidavit establishes probable cause. *Id.* at 305.

"[T]he affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Id.* at 300 (citing *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009)). The nexus "may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." *Id.* at 301 (quoting *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993)). The courts may also "consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence." *Saine*, 297 S.W.3d at 206) (quoting *State v. Reid*, 91 S.W.3d 247, 275 (Tenn. 2002)). "'If the information contained in the affidavit is too old, it is considered stale' and will be insufficient to establish probable cause." *Tuttle*, 515 S.W.3d at 301 (quoting W. Mark Ward, *Tennessee Criminal Trial Practice*, § 4.11 (2016-17)). There is no bright-line rule for determining staleness and "[w]hen the illegal activity described is ongoing, courts have generally held that [an] affidavit does not become stale with the passage of time." *Id.* (quoting *State v. Thomas*, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991)).

In situations where an affidavit is based on the information provided by informants in the criminal milieu, our supreme court in *Tuttle*, abandoned the two-prong *Aguilar/Spinelli* test under the Tennessee Constitution in favor of a totality-of-the-circumstances approach as established in *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). *Id.* at 305. While the two prong *Aguilar-Spinelli* test must no longer be satisfied separately to establish probable cause, they nevertheless remain "highly relevant considerations" under the totality-of-the-circumstances analysis to determine whether an affidavit sufficiently establishes probable cause for issuance of a warrant. *Id.* at 308-09. Those two prongs concern the basis of the informant's knowledge or how the informant obtained the information and the reliability or veracity of the informant. *Tuttle*, 515 S.W.3d at 302-03; *Aguilar v. Texas*, 378 U.S. 108, 114 (1964); *Spinelli v. United States*, 393 U.S. 410, 415-16 (1969). The first prong will be satisfied if the informant obtained the information first-hand or by personal observation. *Tuttle*, 515 S.W.3d at 302. The more detailed the information, the more likely this prong has been met. *Id.* The second prong is satisfied by demonstrating the informant's credibility or showing that the information is reliable. *Id.*

### A. Probable Cause for the Search Warrant[2]

In denying the motion to suppress the evidence seized from the search warrant, the trial court accredited Detective Rinehart's testimony, agreed that the information provided by SOI-1 was "just too old," but found the information provided by SOI-2 to be timely and reliable. It also found that the affidavit established a nexus between the person and place to be searched and criminal activity by identifying Defendant as the seller of methamphetamine and the Fire Department Road residence as the place from which Defendant was selling methamphetamine. The trial court accredited Detective Rinehart's testimony:

> [Detective Rinehart] clearly answered every question that was posed to him no matter who posed the question. He clearly stated he did not remember things that he did not remember, and he acknowledged things that, quite frankly, weakened his case some. And so I find him to be credible. Although he has been an officer since 2012, at the time of this conduct in June of 2019 he had been a narcotics officer for a year or so. He acknowledged that it was he that drafted the search warrant and developed the confidential sources of information.

Next, the trial court found that the person and place to be searched were particularly described:

---

[2] In his motion to suppress, Defendant also moved to suppress his interview with Detective Rinehart. He did not raise this issue on appeal.

And so the law requires that the person or premises to be searched be particularly described and the items to be searched for be particularly described. And here it gives this 209 Fire Department Road, Sweetwater as the premises occupied by [Defendant]. [The magistrate] relied on the affidavit that [Detective] Rinehart prepared.

The trial court then found that the information provided by SOI-2 was not stale:

[I]n paragraph five SOI-2 told [Detective] Rinehart that [Defendant], a named person, is selling methamphetamine in Monroe County and is living at 209 Fire Department Road in Sweetwater. And SOI-2 stated that he or she was inside the residence within the past 72 hours. That is very close in time. That information was not stale. And similar to an argument made by the [State], if law enforcement were to have to state the date and time that a cooperating individual was in the premises, then it would reveal who that cooperating individual was. But within a three-day time period that is very time-sensitive and not [stale] information. It goes on to say that this person saw or observed [Defendant] in possession of multiple ounces of ice methamphetamine inside the residence.

The trial court concluded its review by finding that the affidavit established the credibility and reliability of SOI-2 based on Detective Rinehart's prior dealings with SOI-2:

Paragraph six that speaks to the credibility and reliability of [SOI-2]. I agree with the State. It's general (sic) that this person has participated in multiple prior controlled substance buys helping [Detective] Rinehart and other officers with investigations of other individuals for drug-related crime. And the information that the informant has given the officers has led to the arrest of no less than six persons, along with the conviction of three individuals for drug-related crime. Methamphetamine is a drug. Dealing in meth is a drug-related crime. So this is not a false assertion in any regard.

It goes on to say that [SOI-2] - - the information from [SOI-2] has led to the discovery of illegal controlled substances, drug paraphernalia, and drug proceeds including methamphetamine, marijuana, prescription drugs, scales, pipes, needles, and money.

The officer then swears that . . . never has [SOI-2] provided him with information that has been proven false and the information given by [SOI-2]

has been able to be proven true consistently. So we're not just bound by *Aguilar-Spinelli* anymore. It is a totality of the circumstances.

So this individual with whom the officer is working has proven that he knows what - - he or she knows what meth is, has allowed them to bring charges on six people, and at least three of the individuals have been convicted. I don't read that to believe he's - - the information is right half of the time and wrong half the time. I read it to be that six people are charged, and as of the writing of this warrant, three of them have been convicted. It easily could be a situation like in [Defendant]'s case where here in March 2021 we're talking about conduct that allegedly occurred in June of 2019.

The affidavit provided that SOI-2 had observed Defendant's possessing and selling ice methamphetamine in a residence on Fire Department Road in Sweetwater, where he lived. SOI-2 described with particularity that Defendant had sold methamphetamine in the residence seventy-two hours before Detective Rinehart applied for the warrant. The affidavit provided that SOI-2 was reliable in that SOI-2 had participated in multiple undercover drug operations and had previously provided information leading to the arrest of at least six people and resulting in no less than three convictions.

Additionally, the affidavit sets out Detective Rinehart's experience and training in narcotics trafficking and how dealers manage and protect their businesses, including how traffickers communicate with their customers; how firearms are kept on hand to protect themselves, their drugs, and their money; and how they package the narcotics for distribution.

Defendant relies upon *State v. Archibald*, 334 S.W.3d 212 (Tenn. Crim. App. 2010), to support his argument that the information from SOI-2 was stale. In *Archibald*, this court affirmed the trial court's decision granting the defendant's suppression motion on the ground that the information provided by the confidential informant had become stale as soon as the one-time seller left the apartment. *Id.* at 215-16. We find that *Archibald* is distinguishable from Defendant's case. The information from the sole confidential informant in *Archibald* was limited to one purchase up to seventy-two hours before the search warrant was executed and made no reference to ongoing drug activity. Additionally, the informant failed to identify the seller, whether the seller lived at the apartment that was searched, the quantity of drugs purchased in the undercover buy, or the presence of any other persons or things inside the apartment. *Id.* at 215. In this case, SOI-2 identified Defendant as a seller of methamphetamine and that Defendant was selling from the residence and that Defendant was staying at the residence. SOI-2 had been in the residence and observed Defendant in possession of multiple ounces of ice methamphetamine in the residence. The selling occurred within seventy-two hours of the search and involved an

amount inconsistent with personal use. Under the totality of the circumstances, it supported the finding of the general sessions judge to issue the warrant.

We conclude that Detective Rinehart's search warrant affidavit sufficiently provided a substantial basis for concluding from the totality of the circumstances that a search warrant for Defendant and the residence would uncover evidence of wrongdoing.

## B. Warrantless Search of the SUV

Even assuming the validity of the warrant authorizing the search of the residence, Defendant contends that the trial court erred in denying his motion to suppress the evidence found in the SUV because the warrant did not include the search of a vehicle. The State contends that the search of the SUV was justified by the plain view exception to the warrant requirement. In his brief, Defendant does not address whether the search of the SUV qualified under the plain view exception to the warrant requirement. We agree with the State.

The plain view doctrine, allowing warrantless seizure of evidence in plain view, applies when: (1) the police officer did not violate constitutional mandates in arriving at the location from which the evidence could plainly be seen; (2) the officer had a lawful right of access to the evidence; and (3) the incriminating character of the evidence was "immediately apparent," that is, the officer possessed probable cause to believe that the item in plain view was evidence of a crime or contraband. *State v. Guy*, 679 S.W.3d 632, 681-82 (Tenn. Crim. App. 2023) (citing *State v. Coulter*, 67 S.W.3d 3, 43 (Tenn. Crim. App. 2001), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401, 407 n.3 (Tenn. 2005)); U.S. CONST. amend. IV; TENN. CONST. art. 1, § 7.

The trial court found that the search was proper under the plain view exception to the warrant requirement because the search warrant "gav[e] the officers the right to be on the premises and then in plain view is this weapon." The trial court again accredited Detective Rinehart's testimony that he observed Defendant walking back and forth from the SUV to the residence several times before the search. Detective Rinehart saw the butt of the gun through the window of the SUV as he approached the residence to execute the warrant. He documented what he saw by photographing the interior of the SUV which showed the butt of a gun wedged between the driver seat and the center console. Detective Rinehart was aware that Defendant was a convicted felon and thus prohibited from possessing a weapon. Upon waiving his rights and voluntarily talking to Detective Rinehart, Defendant admitted that he drove the SUV and that there was a gun in it. Although he denied owning the gun, Defendant admitted his fingerprints would be on it. Based on the proof at the suppression hearing and at trial, we conclude that the search of the SUV parked in front of the residence satisfied the plain view exception to the warrant

requirement. Therefore, the trial court properly denied Defendant's motion to suppress. Defendant is not entitled to relief.

## II. Sufficiency of the Evidence

Defendant claims the evidence is insufficient to support his conviction for possession with intent to sell methamphetamine because the proof did not establish that he was in possession of more than 0.5 grams of methamphetamine. He claims that because less than one-tenth of the substance found in his pants was tested and because it was not tested for purity, his possession conviction should be reduced from a Class B felony to a Class C felony. Defendant also claims the evidence was insufficient to support his conviction for possession of a firearm during the attempt to commit a dangerous felony because there was no evidence that he was in possession of the methamphetamine near or inside the SUV where the gun was found. The State disagrees and contends the evidence at trial supported both convictions. We agree with the State on both counts.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt." *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether *any* rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

It is unlawful for a person to possess methamphetamine with the intent to sell or deliver it. *See* T.C.A. § 39-17-434(a)(4). This offense is a Class B felony if the amount "involved is point five (0.5) grams or more of any substance containing . . . methamphetamine[.]" *Id.* § 39-17-417(c)(1). It is a Class C felony if the amount of methamphetamine involved is less than point five (0.5) grams. *Id.* § 39-17-417(c)(2)(A).

Proof of intent to sell or deliver usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (observing that a jury may derive a defendant's intent from both direct and circumstantial evidence). The jury may infer from "the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise

- 17 -

dispensing." T.C.A. § 39-17-419. "Items such as scales, baggies, and weapons in the vicinity of narcotics and/or a defendant have been among those objects found appropriate for consideration in these circumstances." *State v. Morales*, No. E2001-01768-CCA-R3-CD, 2003 WL 21297308, at *8 (Tenn. Crim. App. June 5, 2003).

Possession may be established by showing actual or constructive possession. *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). "While actual possession refers to physical control over an item, constructive possession requires only that a defendant have 'the power and intention . . . to exercise dominion and control over' the item allegedly possessed." *Id.* (quoting *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013)). "[C]onstructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (quoting *State v. Transou*, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996)).

In attacking his methamphetamine conviction, Defendant does not deny that he was found in possession of a bag containing 11.33 grams of methamphetamine and $1,600 cash. Nor does he deny that the gun and the digital scales with residue were found in the SUV. He focuses instead on the weight and purity of the methamphetamine, arguing that the evidence does not support the Class B felony because only "a few grains" of the substance were tested and that the substance was not tested for its purity.

In support of his argument, Defendant relies on *State v. Magness*, 165 S.W.3d 300 (Tenn. Crim. App. 2004). We conclude that his reliance is misplaced. Pursuant to Tennessee Code Annotated section 39-17-417, possession with intent to sell methamphetamine is a Class B felony if the amount is 0.5 grams or more of "any substance containing . . . methamphetamine[.]" In *Magness*, this court addressed the language "any substance containing" and concluded that the legislature's "intent was to follow the market oriented approach[.]" *Id.* at 307-08. That is, "the substance must be *marketable* or *consumable* in order to weigh it." *Id.* at 307. In *Magness*, the methamphetamine substance contained brake cleaner, a non-consumable product. *Id.* at 301. This court thus concluded that the brake cleaner was erroneously included in the weight of the methamphetamine substance because it was neither marketable nor consumable. *Id.* at 307.

This court has addressed the language "any substance containing" in the context of the weighing of cocaine and has held that the State is not required to prove the pure illegal substance weighed more than 0.5 grams, as long as the combined weight of the illegal substance and other substance was greater than 0.5 grams. *State v. Atkins*, No. 02C01-9805-CC-00155, 1999 WL 241870, at *1 (Tenn. Crim. App. Apr. 26, 1999) ("[I]n order to establish a Class B felony under [section] 39-17-417(c), the State need not prove that the pure cocaine in the contraband substance weighed 0.5 grams or more, so long as the weight of the cocaine combined with the other substances totaled 0.5 grams or more."); *see State*

*v. Davis*, No. M2013-01477-CCA-R3-CD, 2014 WL 1354944, at \*7 (Tenn. Crim. App. Apr. 7, 2014) (affirming conviction for possession of more than 0.5 grams of substance containing cocaine when only a small portion of the drugs was tested and no purity testing was performed); *State v. Watkins*, No. M2003-01488-CCA-R3-CD, 2005 WL 351240, at \*2-4 (Tenn. Crim. App. Feb. 9, 2005) (affirming conviction for possession of more than 0.5 grams of cocaine despite the evidence showing only that the defendant "sold a substance containing cocaine weighing 0.5 grams or more and it was not established how much the pure cocaine weighed").

Unlike *Magness*, in this case, there was no evidence that the substance found in Defendant's pants pocket contained a non-consumable or non-marketable substance. Agent Peterson testified that the infrared spectroscopy can only be used if there are no other substances or cutting agents mixed in with the methamphetamine. She was able to test the substance using the infrared spectroscopy because that substance did not include mixtures of other substances. Because the amount of substance tested positive for the structural compounds of methamphetamine, the evidence was sufficient to support the conviction for the Class B felony of possession of methamphetamine with the intent to sell or deliver.

Turning our attention to the firearm conviction, it is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. *Id.* § 39-17-1324(a). A felony involving possession with intent to sell, manufacture, or distribute a controlled substance is a dangerous felony. *Id.* § 39-17-1324(i)(1)(L). Viewing the evidence in the light most favorable to the State, the proof shows that Detective Rinehart saw Defendant drive the SUV before finding methamphetamine and cash in Defendant's pants pockets pursuant to the search. On the day of the search, Detective Rinehart observed Defendant walking back and forth from the SUV to the residence. As he approached the residence to execute the search, Detective Rinehart saw in plain view, the butt of the gun wedged between the driver seat and the center console. Upon his arrest, Defendant admitted to selling drugs. While he denied that the gun belonged to him, he admitted that his fingerprints would be found on the gun. Based on these facts, it was reasonable for the jury to conclude that Defendant possessed the gun in the SUV during the attempt to sell methamphetamine. Defendant is not entitled to relief.

### III.     Expert Witness – Qualification and Cross-Examination

Finally, Defendant claims the trial court erred in declaring Detective Rinehart as an expert in narcotics trafficking in Monroe County and in limiting his cross-examination of Detective Rinehart's expertise under Rule 705 of the Tennessee Rules of Evidence. Specifically, Defendant contends he received no notice of the State's intent to call Detective Rinehart as an expert and was not provided a report underlying his expert opinion

pursuant to Rule 16 of the Tennessee Rules of Criminal Procedure. He also argues that Detective Rinehart did not meet the factors for an expert under *McDaniel v. CSX Transport., Inc.*, 955 S.W.2d 257 (Tenn. 1997), and that the trial court's declaration of Detective Rinehart as an expert put the court's "stamp of approval" on Detective Rinehart's credibility. Defendant also contends that a "dual-role" instruction should have been given because of Detective Rinehart's dual role as a fact witness and an expert witness at trial.

As for his issue challenging the trial court's decision to preclude the defense from questioning Detective Rinehart about a letter by an alleged former informant, Defendant argues that questioning Detective Rinehart about the letter was "proper to test his expertise" under Rule 705. The State contends that the trial court did not abuse its discretion in declaring Detective Rinehart an expert on drug trafficking in Monroe County and that the trial court properly denied Defendant's request to cross-examine Detective Rinehart about the letter because it did not fall within the scope of Rule 705. We agree with the State.

## A. Declaration of Detective Rinehart as an Expert Witness

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). Accordingly, a trial court's evidentiary ruling on the admissibility of an expert's testimony will not be overturned absent an abuse of discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). A court abuses its discretion when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

An expert witness may express his opinion based on "scientific, technical, or other specialized knowledge." Tenn. R. Evid. 702. Before the trial court permits such testimony, the witness's proponent must show (1) that the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and (2) that his opinion will "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* An expert may rely upon matters not in evidence to arrive at his opinion if those facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. However, if the underlying facts upon which the expert bases his opinion lack trustworthiness, the trial court must exclude the expert testimony. *Id.*

In *McDaniel v. CSX Transport., Inc.*, the supreme court identified a list of non-exclusive factors for a trial court to consider when determining the admissibility and reliability of expert testimony. 955 S.W.2d 257 (Tenn. 1997). Those factors include: (1) whether the scientific evidence has been tested and the accompanying methodology with

which it was tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether the potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert conducted the research in the field independent of litigation. *Id.* at 265. While the supreme court later rejected the argument that *McDaniel* applied only to scientific testimony, the court held that "the *McDaniel* factors *may* apply, subject to the discretion of the trial court, 'as reasonable measures of the reliability' of all expert testimony described in Rule 702." *Stevens*, 78 S.W.3d at 834.

In terms of specialized, non-scientific knowledge, this court has held that "[w]hen the State establishes that an officer possesses the necessary training, experience, and familiarity with the illicit drug trade, the officer may testify [as an expert] about matters relating to the business of buying, selling, trading, and use of illegal drugs" under Rule 702. *State v. Elliot*, 366 S.W.3d 139, 147 (Tenn. Crim. App. 2010) (holding that the trial court did not err by permitting a detective to testify as an expert in drug jargon based on his extensive training and experience in the investigation of large-scale drug conspiracies and innumerable drug-trade investigations); *see State v. Jones*, No. M2017-01666-CCA-R3-CD, 2020 WL 2079270, at *6-7 (Tenn. Crim. App. Apr. 30, 2020) (affirming trial court's ruling that an officer had sufficient qualifications to testify as an expert in the illegal drug business based on the officer's extensive experience in drug investigations and interdiction); *State v. Crawford*, No. W2009-00263-CCA-R3-CD, 2009 WL 3233519, at *7 (Tenn. Crim. App. Oct. 7, 2009) (concluding that a drug task force agent qualified as an expert in the illegal drug trade based on his extensive expertise and experience although neither the State nor the trial court referred to him as an expert).

In denying Defendant's objection to Detective Rinehart's testimony regarding his experience and training on drug trafficking in Monroe County, the trial court found Detective Rinehart possessed "specialized knowledge" which would substantially assist the jury given the nature of the proof and the issues of the case:

> So in this case [Defendant] has been accused of possessing these drugs with the intent to sell. And so because there is no direct sale that is being proffered her[e], the jury is going to have to have information as to whether an inference should be made and what facts on which to base that inference. And so information that comes in through the specialized training of an officer who works daily in the field of drugs and methamphetamine transactions and works with dogs and the K9 officers and confidential informants, he would have an ability to develop a base of understanding that would substantially assist the trier of fact to draw such conclusions as is the amount of the drugs alone sufficient to infer resale. [Are] the drugs coupled with the money enough to infer resale? [Are] the drugs and scales – you

know all of that can be argued a variety of different ways. And it would be helpful for persons who are not from within the milieu – drug milieu to have the benefit of the specialized knowledge of an officer.

The trial court further provided the following jury instruction regarding expert testimony:

Merely because an expert witness has expressed an opinion does not mean, however that you are bound to accept this opinion. The same as with any other witness, it is up to you to decide whether you believe this testimony and choose to rely upon it. Part of that decision will depend on your judgment about whether the witness's background or training and experience is sufficient for the witness to give the expert opinion that you heard. You must also decide whether the witness's opinions were based on sound reasons, judgment and information. You are to give the testimony of an expert witness such weight and value as you think it deserves along with all the other evidence in the case.

Detective Rinehart testified that he had been in law enforcement since 2012, first as a corrections officer, and later as a full-time patrol officer. He began working exclusively on narcotics cases in 2018, and since that time, he had executed several search warrants in which methamphetamine was recovered, had conducted multiple traffic stops with a canine unit in which methamphetamine was found, had supervised several undercover drug purchases with confidential informants, had observed the making of methamphetamine in a clandestine laboratory school, and talked to "hundreds" of people regarding the use, price, and distribution of methamphetamine in Monroe County. In light of Detective Rinehart's experience and training in the illegal drug trade, we conclude that the trial court did not abuse its discretion in allowing him to offer his opinion as to the street value of the drugs found on Defendant, along with the large amount of cash, the digital scales, and the gun.

At trial, Defendant made multiple arguments against the qualification of Detective Rinehart as an expert witness. On appeal, Defendant limits his argument to claiming that the trial court's ruling was erroneous because Detective Rinehart did not qualify as an expert under the *McDaniel* factors and that he was not provided notice under Rule 16 of the Tennessee Rules of Criminal Procedure.

As for his contention regarding the *McDaniel* factors, Defendant advances no argument as to how those factors are relevant to determine the admissibility and reliability of Detective Rinehart's testimony as an expert. While the *McDaniel* factors are not limited to scientific evidence, they may not easily lend themselves to non-scientific specialized knowledge where testing or potential rate of error are not the basis of a witness's expertise.

*Stevens*, 78 S.W.3d at 833-35. Here, as held by the trial court, the evidence is generally accepted in the law enforcement community for conducting narcotics investigation and developing expertise in the area. *Elliot*, 366 S.W.3d at 147-48. This claim is without merit.

Insofar as the lack of notice regarding the State's intent to call Detective Rinehart as an expert, we conclude that Defendant has not shown prejudice. Under the criminal rules for the discovery and inspection of evidence, if an "item is within the state's possession, custody, or control[,]" the State is required to disclose "reports of examination and tests" to the defendant. Tenn. R. Crim. P. 16(1)(G). While Detective Rinehart was on the witness list supplied to Defendant, he was not designated as an expert. At trial, the State did not dispute the lack of notice but argued that it had not violated Rule 16 because there was "no report" to provide to the defense because Detective Rinehart's expertise was not based on scientific testing such as the tests conducted by Agent Peterson to determine the substance found in Defendant's possession. Moreover, as evidenced by the above cited cases and as noted by this court a decade prior, "it is now expected that police will testify as to the certain methods and processes in the drug trade, [therefore] we question whether designation as an expert is required for the defendant to be 'on notice.'" *State v. Jones*, No. W2013-00333-CCA-R3-CD, 2014 WL 6680680, at *9 (Tenn. Crim. App. Nov. 26, 2014). This claim is without merit.

In his reply brief and at oral argument, Defendant argued that the trial court should have given a "dual-role" jury instruction because Detective Rinehart testified as both a fact witness and as an expert. *See United States v. Thomas*, 74 F.3d 676, 682-83 (6th Cir. 1996) (holding that when an officer testifies as a fact witness and as an expert witness, the jury should be informed of the dual roles of the officer so that the jury can give proper weight to each type of testimony), *abrogated on other grounds by Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 143 (1997).

First, the record reflects that Defendant did not request a special dual-role instruction at trial nor did Defendant raise it in the motion for new trial or the amended motion for new trial. Rather, he presented this argument for the first time in his reply brief and at oral argument. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Defendant here is complaining that the jury charge – without a dual-role instruction – was incomplete, not erroneous. Thus, the issue is waived, and we may review it, if at all, for plain error. *See id.* at 58 (reviewing the jury instruction error issue for plain error when the defendant failed to object contemporaneously and failed to raise it in his three motions for new trial).

To obtain relief under plain error, the defendant must demonstrate the existence of five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). Unless all five factors are established in the record, this court will not recognize the existence of plain error. *Id.*

Because no unequivocal rule of law was breached by the jury instructions, Defendant is not entitled to plain error relief. In both his reply brief and at oral argument, counsel for Defendant acknowledged that Tennessee courts have not required a dual-role instruction when a law enforcement officer testifies as both an expert and as a fact witness at trial. *Patterson v. State*, No. E2022-01401-CCA-R3-PC, 2023 WL 5969299, at *10-12 (Tenn. Crim. App. Sept. 14, 2023), *no perm. app. filed*. Defendant is not entitled to relief.

## B. Cross-examination of Detective Rinehart under Rule 705

Defendant also claims that the trial court erroneously restricted the cross-examination of Detective Rinehart with the letter from a confidential source, arguing that he was seeking to test Detective Rinehart's expertise. Tennessee Rule of Evidence 705 refers to the cross-examination of an expert and provides:

> The expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

The extent of permissible disclosure of information on cross-examination is broader than what may be disclosed on direct examination under Rule 703. "Once the evidence [of the expert's opinion] has been admitted, the defense is given broad latitude to test the validity of the expert's opinion on cross[-]examination." *State v. Farner*, 66 S.W.3d 188, 208 (Tenn. 2001).

During cross-examination, the State objected and requested a jury-out hearing when the defense asked Detective Rinehart about another confidential informant. Relying on Rule 705 of the Rules of Evidence, Defendant argued that questioning Detective Rinehart about the informant was relevant because Detective Rinehart's experience working with informants on undercover drug purchases formed the underlying facts or data upon which he based his testimony as an expert in drug trafficking in Monroe County. Defendant maintained that the letter was necessary to impeach Detective Rinehart's trial testimony

that he paid informants in money for their participation in undercover operations because according to the letter, Detective Rinehart "appear[ed]" to have permitted informants to use drugs while working on an operation, a fact which contradicted his trial testimony.

After reading the letter, the trial court made the following findings:

This letter, and I've read the whole thing, is written by a woman who claims to have been held against her will for four years on a murder. Then she talks about needing to go back to California. She talks about all these – I don't know what I brought him 18,000 bust – I don't even know what that means. And I don't think it says that she used drugs for [Detective] Rinehart. I think this – this is hearsay. And unless she's here to be cross-examined to understand what she was saying, this cannot be used to impeach the officer. But you can ask the officer did he rely on a letter from [the informant] to [General Sessions Judge] on February 18, 2020 to form his opinion as to the drug trafficking in Monroe County. If he says yes, then I guess it goes to the jury. If he says no, I think we should have it marked as an exhibit [for identification] only[.]

The trial court agreed that under Rule 705, an expert witness may be cross-examined on hearsay evidence which was the basis of the expert's testimony and posed the following suggested question to Detective Rinehart: "[H]ave you formed any opinion in reliance on that letter to [General Sessions Judge] by the writer of the letter?" Detective Rinehart answered "no." Defense counsel acknowledged that because the letter was written after the incidents, "there's no way that [Detective Rinehart] could have relied" on the letter as contemplated by Rule 705.

The trial court did not abuse its discretion in denying Defendant's request to question Detective Rinehart about the letter. Detective Rinehart denied that the letter formed the basis for his opinion in the case. Moreover, the letter did not evince Detective Rinehart's alleged untruthfulness. This issue is without merit; Defendant is not entitled to relief.

**CONCLUSION**

For the foregoing reasons, we affirm the judgments of the trial court.

s/ Jill Bartee Ayers

JILL BARTEE AYERS, JUDGE

- 25 -